IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THELMA WOLFE                        :

    Plaintiff                       : Case No. 3:16-CV-20

    v.                              :(Judge Richard P. Conaboy)

CAROLYN W. COLVIN                   :
Commissioner of Social Security
                                        :

    Defendant                       :

_____

**Memorandum**

## I.    Procedural Background.

We consider here Plaintiff's appeal from an adverse decision of the Social Security Administration.  ("Agency") or ("SSA").  The Agency initially denied Plaintiff's application for disability insurance benefits ("DIB") by decision of ALJ Michele Stolls dated May 19, 2011. The Agency's decision became a "final decision" pursuant to 42 U.S.C. §405(g) when the Appeals Council denied Plaintiff's request for review on July 20, 2012.  Plaintiff filed a timely appeal to this Court on September 19, 2012 and this Court ultimately remanded this case to the SSA for further proceedings on April 29, 2014.[1]   After the conclusion of additional proceedings,

_____

[1] Judge Mannion, who issued the remand opinion, found that the ALJ had "improperly injected her own lay opinion as to what signs and symptoms the Plaintiff should have experienced in relation to her complaints of pain.  The ALJ should have instead relied upon the medical evidence of record which, despite the ALJ's finding, contains repeated references of antalgic gait and limited

including another hearing before ALJ Stolls, Plaintiff's claim was denied once again and that denial was affirmed once again by the Appeals Council on November 6, 2015.  Plaintiff has appealed the Appeals Council's decision by Complaint (Doc. 1) filed January 6, 2016, thus bringing this matter once again before this Court.  The parties have briefed their respective positions and the case in now ripe for disposition.

**II.   Testimony Before the ALJ.**

   **1.   Hearing of April 19, 2011.**

The testimony may be summarized as follows.  Plaintiff was 46 years of age on the date of the hearing.  She was then 5'5' tall and weighed 255 pounds.  She lived with her fiancee and her children in East Stroudsburg, Pennsylvania.  Her only source of income was from a Workman's Compensation award.  She had last worked for the New York City Transit Authority and had stopped working when she suffered an accident on the job on August 30, 2008.  (R.593-94).

Her children were then 18 and 19 years of age respectively and she described them as "pretty self-sufficient" and stated further that they help her around the house.  She drives and denied that she attended religious services or indulged in any hobbies.  The

range of motion." (M.D. Pa. Case No. 3:12-CV-01868, Doc. 18 at 29).  Accordingly, Judge Mannion remanded the matter for reconsideration of the level of credibility to be attached to Plaintiff's subjective complaints of pain.

only time she has taken a trip since she has stopped working was when she went to "Carolina" for her son-in-law's funeral. She made that trip by Amtrak. (R.594-95).

Plaintiff indicated that she had two years of college education and no military service. She stated that she cannot work for multiple reasons including: irritable bowel syndrome; hip pain; migraine headaches; asthma; and depression. She takes Percoset for pain. Her migraines had been a sporadic problem but after her debilitating accident of August 30, 2008 they became a more serious problem. Light and loud noise seem to trigger her migraines. (R.596-98).

Plaintiff stated that she does nothing on a daily basis and that a girlfriend helps her do her grooming. She lifts nothing heavier than her pocketbook.[2] She cannot walk very far because of pain in her left leg. When she goes food shopping with her daughter or her husband, she is typically on her feet for no more than 15-20 minutes and that is the outer limit of how long she can walk. (R.599-600).

Plaintiff had last worked as a train operator for the New York City Transit System. While doing that job on August 30, 2008 she slipped while walking through the train and hurt her back. She had worked in various capacities for the New York City Transit System

---

[2] The ALJ lifted Plaintiff's pocketbook at the hearing and estimated on the record that it weighed approximately ten pounds.

for approximately 19 years before her injury.  She describes her back pain as "excruciating" and states that she suffers from frequent muscle spasms that move from her left hip around her back and down her left leg.  At times her left leg gives way entirely. The pain, particularly the pain in her left hip, makes it very difficult for her to sleep at night.  When she is sitting down she must get up every 15 minutes and change position for a few minutes to alleviate the pain in her left hip.  She alternates between Vicodin and Tramadol to blunt her hip pain. Both these medications make her drowsy.  She takes these medications as needed and uses them to some extent everyday.  (R.601-06).

Also testifying at the Plaintiff's hearing was a Vocational Expert, Gerald W. Keating.  The ALJ posed three separate hypothetical questions to Mr. Keating.  Mr. Keating was asked to consider an individual whose RFC permitted sedentary work, limited by the ability to be able to sit and stand at will, limited to occupations that require only occasional balancing, stooping, crawling, kneeling, crouching, climbing on ramps or stairs, no exposure to climbing ladders, ropes and scaffolds, no pushing and pulling of the lower left extremity, avoidance of concentrated and prolonged exposure to fumes, odors, dust, gases, chemical irritants, environments with poor ventilation, cold temperature extremes, excessive noise, excessive vibration, extreme dampness or humidity, and occupations which include dangerous machinery or

4

heights, or occupations which require more than the performance of simple, routine tasks not performed in a fast-paced production environment.  Mr. Keating testified that, as representative samples, such an individual could perform the positions of small products assembler, telephone receptionist, or telephone solicitor, non-sales.

The ALJ's second hypothetical question asked Mr. Keating to consider that the individual already described had additional restrictions of no more than occasional overhead reaching, pulling, or pushing with the upper extremities to include the operation of hand levers and overhead work.  Mr. Keating stated that even with these additional limitations the jobs he had previously identified could be performed by such an individual.

Finally, the ALJ asked Mr. Keating to consider all limitations already identified in the two previous hypothetical questions and to also assume that the hypothetical individual would be off task for more than 30 per cent of the workday due to chronic back and lower extremity pain, plus migraine headaches and neck pain.  When these additional restrictions were added to the hypothetical question, Mr. Keating testified that such an individual could not function in any work environment.

**2.    Hearing of September 4, 2014.**

Plaintiff's testimony may be summarized as follows.  She still holds a driver's license but drives infrequently.  She has made

only one long trip (to New York) since the previous hearing.  Her husband drove the entire time and she found it necessary to stop and stretch in route.  She no longer gets her hair done because the medication she takes has caused her hair to fall out.  Thus, she now wears a wig.  (R.618-20).

In October of 2013 Plaintiff was driving in rainy conditions and she lost control of her vehicle.  This caused her to run into the guardrail and then reenter the road.  Upon reentering the road, her vehicle was struck by a large truck.  She has not instituted any legal action as a result of that accident.  (R.620-21).

She testified that she is under treatment from Dr. Krishna, a physician in New York.  When asked why she had not sought a doctor in Pennsylvania she replied that Dr. Krishna had been treating her since her work-related accident in 2008 and she chose to remain his patient.  She has elected not to undergo surgery for her back injury because she is afraid.  Her back symptoms are more troubling than her neck symptoms.  However, her neck symptoms have not improved.  (R.621-623).  Plaintiff changed the medication for her rheumatoid arthritis because the medication she tried first was making her sick and causing her hair to fall out. She has not worked since August of 2008.  She and her husband survive on her Workman's Compensation check and her husband's retirement.  (R.623).

Plaintiff indicated on a function report in March of 2010 that

6

she cooked and did dishes to some extent dependant upon her pain level.  At that time, she was still driving, handling money, shopping, socializing on the telephone, and using a cane.  At the time of her second hearing her children, who are now 19 and 21 years of age, do the majority of the housework.  She estimates that she may be able to stay on her feet for as much as one hour dependent on her pain level.  She must be careful because her knees give out at times and she has fallen on steps three times as a result.  Both knees hurt but her right knee is more problematic.  She can sit still for as much as one-half hour but that, too, depends upon her level of back pain.  When the pain is bad she must move around more often.  (R.623-24).  She believes that the most she can lift or carry would be five to ten pounds.  Her lifting capacity also varies dependent upon the way her right shoulder and right elbow feel.  She has undergone surgery on both her right elbow and right shoulder and believes that she is deteriorating in both locations.  She takes various pain medications including Flexeril and uses Topomax for her migraine headaches.  She also takes Protonix for her irritable bowel syndrome.  She has at times used Vicodin, Percoset and Dilaudid for pain.  Percoset makes her nauseous and she uses Dilaudid only when her pain is excruciating. (R.625-26).

Plaintiff's pain is so bad on three to four days each month that she does not get out of bed.  Her back pain radiates down her

legs at times.  Every night is a battle for sleep because her pain does not permit her to get sustained rest.  At times her shoulder aches so much that it affects her neck and she thinks this causes her migraines.  She had migraine headaches approximately three times a week and these are so severe that she must sit in total darkness when one comes upon her.  (R.627).

Plaintiff states that she takes Buspar for anxiety.  Dr. Krishna prescribed Buspar and she had been taking it for about one year.  She also uses a knee brace, a back brace, and a boot-like device to keep her left foot in a certain position to alleviate plantar fascitis in her left foot.  A Dr. Parnes prescribed her cane about two years earlier.  She uses Ambien to help her sleep. The Ambien in combination with her Flexeril dose helps her sleep but she feels groggy much of the time.  Her daughter and her husband do all the shopping and, while she sometimes goes with them, she generally does not even go into the store because the walking is too much for her.  Her daughters do the laundry and most of the cooking.  Her cooking is confined to making simple things like eggs and toast.  She states that cold weather exacerbates her rheumatoid arthritis.  No physician recommended additional surgery for her right shoulder or elbow in the last two years.  She has gained a lot of weight and she suspects that her use of Prednisone is a cause of her weight gain.  She weighed about 215 pounds when she suffered her work-related injury in 2008 and now weighs 255

pounds.  (R.628-32).

     Also testifying was a Vocational Expert, Josephine Doherty.
Ms. Doherty stated that her testimony was based upon her training,
experience, and familiarity with the Dictionary of Occupational
Titles.  She indicated that she was familiar with Plaintiff's work
history.  The ALJ asked her to assume an individual who is the same
age, education, and work experience as the claimant.  She was asked
to further assume that this hypothetical person has the residual
functional capacity to perform sedentary work that is further
restricted to a sit/stand at will option.  The hypothetical
claimant also can only occasionally balance, stoop, and climb ramps
or stairs and never climb ladders, kneel, crouch, or crawl.  The
hypothetical claimant cannot operate foot pedals with her lower
extremities and is limited to only occasionally reaching overhead
or pushing or pulling with her upper extremities.  The hypothetical
claimant also much avoid exposure to fumes, dust, odors, chemical
irritants, cold temperatures, excessive noise, and excessive
dampness and humidity.  She cannot be exposed to dangerous
machinery or unprotected heights and is limited to occupations
requiring simple tasks only that are not performed in a fast-paced
production environment.  Finally, the hypothetical claimant must
function in a workplace where few changes occur.  Based upon these
assumptions, the Vocational Expert testified that such a claimant
would be unable to perform Plaintiff's past relevant work.  The

9

Vocational Expert stated further that there are sedentary, unskilled positions that the hypothetical claimant could perform such as a charge account clerk, a ticket counter, or an inspector. (R.633-35).

When the ALJ asked the Vocational Expert to assume the same limitations as in the first hypothetical question plus an additional limitation requiring the use of a cane, the Vocational Expert stated that this additional restriction would not preclude performance of the three jobs she had identified. Then, when the ALJ asked that she also assume all previous limitations plus the additional limitation that Plaintiff would be off task for 30 percent of the workday due to pain, the Vocational Expert stated that no work would be available for such a person. (R.36).

Plaintiff's attorney asked the Vocational Expert whether, assuming all other hypothetical limitations previously discussed and modifying the time off-task due to pain to 10 percent of the work day whether Plaintiff would be employable. The Vocational Expert stated that the job base would be eroded but not completely eliminated. Plaintiff's attorney then inquired, assuming Plaintiff could sit no more than two hours and stand no more than two hours in an eight-hour workday, whether she would be able to do any of the jobs that the Vocational Expert had identified. The Vocational Expert responded that such an individual would be unable to sustain any full-time job. (R.637-38).

10

### III. Medical Evidence.

#### A.   Dr. Parnes.

On September 2, 2008, Plaintiff underwent a physical examination by Dr. Marc Parnes in Brooklyn, New York.  Dr. Parnes stated that the examination revealed a lumbosacral derangement with sprain and strain and spasms.  He noted painful, spastic, and significantly limited bending and ambulation.  Plaintiff exhibited positive straight-leg raising signs bilaterally.  Dr. Parnes diagnosed Plaintiff to be suffering from "traumatic lumbosacral derangement with sprain and strain and spasm.  Bilateral radiculopathy.  Left hip sprain."  (R.507-08).

#### B.   Dr. Lattuga.

On May 29, 2009, Plaintiff was seen by Dr. Sebastian Lattuga, an orthopedic surgeon, at the request of Dr. Ranga Krishna, about whom we will hear more later.  Dr. Lattuga's report of his "spinal consult" with Plaintiff indicates that she had complaints of neck and back pain with radiation into both the upper and lower extremities.  Dr. Lattuga documented both tenderness and spasms in Plaintiff's cervical and thoracolumbar spinal regions.  He also noted "sensation is altered in the C6, L5-S1 nerve root distributions, positive straight-leg raise test."  Dr. Lattuga diagnosed "cervical radiculopathy, sprain" and "lumbar radiculopathy, sprain" and advised Plaintiff "to refrain from activity that exacerbates symptoms such as heavy lifting, carrying,

or bending." (R.186-88).

   C.   **Dr. Mazella.**

   Plaintiff was seen by Dr. John Mazella, an orthopedic surgeon, on three occasions.  Each of these related to referrals by the New York City Transit Authority for evaluation of Plaintiff's physical status secondary to her work-related injury.  After conducting the first of these evaluations on October 1, 2008, Dr. Mazella reported that "she walked with a small antalgic gait pattern weight bearing on the left."  She was experiencing mild spasm in the left side of her back with attendant myofascial irritation.  Her straight-leg raising test was negative bilaterally but she could not complete the Patrick maneuver due to left hip pain.  Range of motion in her left hip was significantly restricted due to groin pain.  Dr. Mazella diagnosed left hip groin adductor strain and lumbar stain/sprain without radiculopathy.  He concluded that Plaintiff was experiencing a moderate partial temporary orthopedic disability and was able to work with the following restrictions: lifting, carrying, pushing, and pulling not to exceed ten to twenty pounds; twisting, climbing, and bending to be avoided; limited walking; and no exposure to heights, moving machinery, or repetitive movements. (R.259-262).

   On April 15, 2009, Dr. Mazella saw Plaintiff a second time. His notes of that examination confirmed that Plaintiff underwent MRI's on February 20, 2009 that indicated she had (1) a bulging

12

disc at C3-4, C6-7, with mild left neural foraminal stenosis at C3-4; and (2) a bulging disc at L5-S1.  Dr. Mazella's examination of Plaintiff's cervical spine disclosed no spasms, no identified trigger points, and only minimally limited range of motion.  However, two trigger points were identified in the left lumbar area and forward flexion produced left-sided lower back pain.  Once again, the Patrick test was positive for left lower back pain but, unlike the results of October 1, 2008, negative for hip pain.  Dr. Mazella diagnosed: (1) cervical strain/sprain without radiculopathy and (2) lumbar strain/sprain with myofascial irritation trigger point left side without radiculopathy.  Dr. Mazella described Plaintiff's status as one of "mild partial temporary orthopedic disability" and recommended exactly the same limitations he had proposed on October 1, 2008 except that he stated that her ability to push, pull, lift, or carry had increased such that she could handle up to 25 pounds.  Dr. Mazella also indicated that she should receive trigger point injections in her lumbar spine.  (R.253-57).

On July 1, 20009, Plaintiff saw Dr. Mazella, again on consult, for the last time.  Dr. Mazella's notes indicate that Plaintiff entered the examining room "without limp or cane."  He noted also a single sharp trigger point in the lumbar area without attendant spasm.  Range of motion of Plaintiff's lumbar spine was restricted in all planes.  Plaintiff had a positive straight-leg raising test on the left side with mild left leg weakness.  She was experiencing

13

mild to moderate left-sided trapezial and paracervical muscle spasm.  Plaintiff's Sperling sign was positive over the C6-7 dermatome.  Plaintiff's upper extremity neurological exam was focal to the left side with 4/5 weakness and C6-7 dermatomal hypesthesia.[3]  Dr. Mazella noted, too, that Plaintiff was indicated for both cervical and lumbar epidural steroid injections as well as a lumbar trigger point injection.[4]

Dr. Mazella's diagnoses changed per his report of July 1, 2009 to indicate: (1) cervical strain/sprain with left-sided radiculopathy and (2) lumbar strain/sprain with myofascial trigger point and left-sided sciatic radiculopathy.  Thus, while Dr. Mazella's impressions of Plaintiff's situation remained fairly constant during three consults over a period of approximately nine months, he did note both lower and upper extremity radiculopathy for the first time after the last consult on July 1, 2009.  Dr. Mazella continued to opine that Plaintiff could work provided she work within the capacities described in his office notes of the April 15, 2009 session with Plaintiff.  (R.243-245).

**D.   Dr. Nowak.**

Dr. Miroslawa Nowak, a rheumatologist, saw Plaintiff on several occasions.  Dr. Nowak's assessment of Plaintiff's blood

---

[3] Hypesthesia is a diminished sensitivity to touch or other stimuli.  See Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health, 7th Edition.

[4] The record indicates that Plaintiff underwent these procedures, performed by Dr. Mehrdad Hednayatnia, on March 3, 2011.  (R.509-510).

work indicated the presence of anti-nuclear bodies (ANA) an
indicator of rheumatoid arthritis, lupus, or other autoimmune
disease.  Dr. Nowak's physical examination of Plaintiff revealed
synovitis (an inflammation of a synovial sac) in both the
metacarpal and metatarsal regions of Plaintiff's left foot.
Considering Plaintiff's hands and feet, she had six tender joints
and four swollen joints.  Dr. Nowak's assessment was inflammatory
polyarthritis, not otherwise specified, and rule out rheumatoid
arthritis.  Dr. Nowak's prescribed prednisone to alleviate
Plaintiff's inflammation along with Plaquenil and Soma to be taken
long term.  (R.421-427).

**E.   Dr. Krishna.**

Dr. Ranga Krishna, a neurologist, treated Plaintiff from an
initial appointment on September 28, 2008 through at least
September 24, 2010.  The record indicates that Dr. Krishna examined
Plaintiff at no fewer than 14 occasions over this two year period.
A review of his office notes of these examinations reveals that Dr.
Krishna consistently found that Plaintiff suffered from spasms in
the cervical and lumbar regions and displayed an antalgic gait.
Dr. Krishna's impression throughout his numerous encounters with
Plaintiff was that she was afflicted by a cervical and lumbar
strain injury and neuropathic pain syndrome.[5] From November of 2008

---

[5] Neuropathic pain results from damage to or dysfunction of the peripheral central nervous system, rather than stimulation of pain receptors.  Diagnoses is suggested by pain out of proportion to tissue injury, dysthesia (e.g. burning, tingling) and signs of nerve injury detected during neurologic

through September of 2010, Dr. Krishna consistently indicated that Plaintiff experienced radiculopathy in her lower extremities. (R.433-505).

On January 20, 2009, Dr. Krishna stated that Plaintiff's persistent complaints of back and neck pain had not improved despite therapy and long term medication.  On this occasion, Dr. Krishna noted for the first time that Plaintiff experienced neck pain that radiated into her arms.  He noted also that her neck pain was exacerbated by Valsalva maneuvers and her lower back pain increased when she would walk, bend, or climb stairs.  The diagnosis at this time changed to cervical and lumbar sprain with radiculopathy and attendant neuropathic pain syndrome.  (R.438).

On May 4 and May 29, 2009, Dr. Krishna noted that Plaintiff's lumbar pain had increased and she was experiencing pain radiating from her buttocks down the lateral aspect of both legs along with tingling in the legs and occasional numbness in the feet and toes. On both these dates, Dr. Krishna gave Plaintiff epidural steroid injections at the L5-S1 level to try to alleviate her pain.  On both occasions he noted that the injections provided Plaintiff with "good" pain relief.  The examinations of May 4 and May 29, 2009 also disclosed positive paravertebral trigger points along the Plaintiff's lumbar spine.  (R.444-448).

On August 17, 2009, Dr. Krishna's examination indicated that

---

examinations.  See Merckmanuals.com.

the Plaintiff was doing better in terms of pain and that she could go back to work without restrictions.  His impression at that time was "lumbar strain injury resulting in radiculopathy.  Left hip pain." (R.466).  Then, approximately one month later on September 21, 2009, Dr. Krishna's evaluation changed markedly.  His notes of that session with Plaintiff indicate: "the patient's critical features are consistent with a chronic lumbar and cervical neuropathic pain syndrome.  The lumbosacral neuropathic pain syndrome seems to have worsened."  Dr. Krishna expressed an intention to obtain electrodiagnostic studies of the Plaintiff's lower extremities and reassess her afterward.  The electro-diagnostic study obtained by Dr. Krishna on September 21, 2009 revealed evidence of chronic radiculopathy at the L5-S1 level. (R.469-477).

From September 21, 2009 through the last of Dr. Krishna's treatment notes in the record, that of September 24, 2010, he consistently noted that Plaintiff was totally disabled as a result of persistent pain in the lumbar region that could not be relieved by pain medications.  During this entire period of more than one year, the Plaintiff exhibited positive paravertebral trigger points along her lumbar spine with numbness in her legs and feet.  On four occasions during this period Dr. Krishna gave Plaintiff epidural injections at L5-S1.  Each resulted in "good" pain relief and a modest improvement by VAS scale.  The "good" relief afforded the

patient was apparently only temporary as evidenced by the frequency and duration of these injections.  (R.478-501).

Dr. Krishna also executed two functional capacity evaluations regarding Plaintiff.  The first of these is dated December 4, 2009. Dr. Krishna described the laboratory findings from the cervical and lumbar MRI's that had been discussed above and estimated: (1) Plaintiff's impairment had lasted or could be expected to last at least 12 months; (2) Plaintiff could lift 0-5 pounds frequently; (3) Plaintiff should never lift more than 5 pounds; (4)Plaintiff could never stoop, crouch, kneel, bend, climb or balance; (5) Plaintiff can walk no more than one block; (6) Plaintiff cannot use public transportation alone; (7) routine activities exacerbate Plaintiff's pain and make her condition worse; and (8) Plaintiff is unable to work in any functional capacity.  (R.276-280).

Dr. Krishna executed a second functional capacity evaluation of Plaintiff on March 16, 2010.  On that evaluation he indicated: (1) Plaintiff gave maximum, consistent effort while tested; (2) Plaintiff could stand for about 10 minutes; (3) Plaintiff could lift 5-10 pounds; (4) Plaintiff had decreased ability to do forward bending or rotation whether sitting or standing; (6) Plaintiff experienced a loss of balance during strong effort; and (7) Plaintiff had a decreased tolerance for sitting more than 10 minutes.

18

**IV.  ALJ Decision.**

The ALJ's decision (Doc. 12-2 at 18-31) was unfavorable to the Plaintiff.  It included the following Findings of Fact and Conclusions of Law:

1.   The claimant meets the insured status requirement of the Social Security Act though December 31, 2012.

2.   The claimant had not engaged in substantial gainful activity since August 30, 2008 the alleged onset date.

3.   The claimant has the following severe impairments: obesity (5 feet 5 inches tall, 240 pounds), asthma, history of left hip sprain, degenerative disc disease of the cervical spine, and degenerative disc disease of the lumbar spine.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(b), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except her ability to work at that level is reduced in that she

19

must be afforded the option to sit or stand at will. She is limited to occupations that require no more than occasional postural maneuvers, such as balancing, stooping, kneeling, crouching, crawling, and climbing on ramps and stairs.  The claimant must avoid occupations that require climbing on ladders, ropes, and scaffolds and she must avoid occupations that require pushing and pulling with the lower left extremity to include the operation of pedals.  She is limited to occupations that require no more than occasional overhead reaching, pushing and pulling of the upper extremities to include the operation of hand levers, and overhead work.  The claimant must avoid concentrated, prolonged exposure to fumes, odors, dust, gases, chemical irritants, environments with poor ventilation, cold temperature extremes, excessive noise, vibration, extreme dampness, and humidity.  She is limited to occupations which do not require exposure to hazards such as dangerous machinery and unprotected heights. The claimant is limited to occupations requiring no more than simple, routine tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general,

relatively few work place changes.

6.   The claimant is unable to perform any past relevant
work.

7.   The claimant was born on January 12, 1965 and was 43
years old, which is defined as a younger individual
18-44, on the alleged disability onset date.

8.   The claimant has at least a high school education
and is able to communicate in English.

9.   Transferability of job skills is not material to the
determination of disability because under the
Medical Vocational Rules as a framework supports a
finding that claimant is "not disabled" whether or
not the claimant has transferable job skills.

10.  Considering the claimant's age, education, work
experience, and residual functional capacity, there
are jobs that exist in significant numbers in the
national economy that the claimant can perform.

11.  The claimant has not been under a disability, as
defined in the Social Security Act, from August 30,
2008 from the date of this decision.

**V.   Disability Determination Process.**

The Commissioner is required to use a five-step analysis to

determine whether a claimant is disabled.[6]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person

_____

[6] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R.27-28).

## VI. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel*
> *non* of substantial evidence is *not* merely a
> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality

test if the Secretary ignores, or fails to
resolve, a conflict created by countervailing
evidence.  Nor is evidence substantial if it
is overwhelmed by other evidence--
particularly certain types of evidence (e.g.,
that offered by treating physicians)--or if
it really constitutes not evidence but mere
conclusion.  *See Cotter*, 642 F.2d at 706
("Substantial evidence" can only be
considered as supporting evidence in
relationship to all the other evidence in the
record.") (footnote omitted).  The search for
substantial evidence is thus a qualitative
exercise without which our review of social
security disability cases ceases to be merely
deferential and becomes instead a sham.

710 F.2d at 114.

     This guidance makes clear it is necessary for the Secretary to
analyze all evidence.  If she has not done so and has not
sufficiently explained the weight given to all probative exhibits,
"to say that [the] decision is supported by substantial evidence
approaches an abdication of the court's duty to scrutinize the
record as a whole to determine whether the conclusions reached are

24

rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported

25

by substantial evidence, shall be conclusive . . .").  "However,
even if the Secretary's factual findings are supported by
substantial evidence, [a court] may review whether the Secretary,
in making his findings, applied the correct legal standards to the
facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d
Cir. 1983) (internal quotation omitted).  Where the ALJ's decision
is explained in sufficient detail to allow meaningful judicial
review and the decision is supported by substantial evidence, a
claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v.
Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir.
2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d
112 (3d Cir. 2000) ("[O]ur primary concern has always been the
ability to conduct meaningful judicial review.").  An ALJ's
decision can only be reviewed by a court based on the evidence that
was before the ALJ at the time he or she made his or her decision.
*Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## VII. Discussion.

### A. General Considerations

At the outset of our review of whether the ALJ has met the
substantial evidence standard regarding the matters at issue here,
we note the Third Circuit has repeatedly emphasized the special
nature of proceedings for disability benefits.  *See Dobrowolsky*,
606 F.2d at 406.  Social Security proceedings are not strictly
adversarial, but rather the Social Security Administration provides

an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

    **B.   Plaintiff's Allegations of Error.**

    **1.   Whether the ALJ Failed to Afford Proper Evidentiary Weight to the Opinion of the Treating Physician?**

Plaintiff asserts that the ALJ improperly subordinated the medical opinion of treating physician Ranga Krishna, a board-certified neurologist, to that of a mere examining physician, Dr. John Mazella, who saw Plaintiff on only three occasions for consults at the request of the Plaintiff's workman's compensation carrier. Plaintiff correctly asserts that a treating physician is entitled to a great deal of deference under the case law of this circuit. The opinions of treating physicians are entitled to great

weight, particularly when based upon a longtime doctor/patient relationship as is the case before us.  Morales v. Apfel, 225 F.3d 310, 317 (3d. Cir. 2000).  An ALJ is categorically precluded from making a residual functional capacity ("RFC") assessment that contradicts a treating physician's opinion in the absence of medical evidence that contradicts the treating physician's conclusion.  Doak v. Heckler, 790 F.2d 26, 29 (3d. Cir. 1986).  To do so is to make an RFC determination that is unsupported by substantial evidence and, thus, void.  Diller v. Acting Commissioner of Social Security, 962 F. Supp. 2d. 761, 769 (W.D. Pa. 2013).  In light of this case law, the question that must be answered is whether the record contains medical evidence that refutes the opinion of treating physician Krishna that Plaintiff was completely disabled.

The ALJ states: the medical examinations conducted by Dr. Mazella showed few limitations and he stated that "claimant was capable of light work."  (R.26).  Actually, Dr. Mazella concluded that Plaintiff was experiencing "a moderate partial temporary orthopedic disability" and was capable of working with the following restrictions: "lifting, carrying, pushing and pulling should not exceed 10-20 pounds.  Twisting, climbing, and bending movements are to be avoided.  Walking is limited.  She cannot work at heights, operate a motor vehicle and/or mechanical equipment at work, or perform repetitive movements."  (R.262).  While Dr.

Mazella never addressed "light work" as a term of art in the lexicon of the Social Security regulations, the physical capacities he assigned Plaintiff are easily within the ALJ's RFC determination of <u>sedentary</u> work with even more additional limitations than Dr. Mazella believed necessary.  We may not set aside the agency's decision if it is supported by substantial evidence even if we would have reached a different conclusion.  Hartranft v. Apfel, supra, at 360).  Accordingly, we find that the record does establish the ALJ had the medical evidence to assign more weight to Dr. Mazella's RFC determination than that provided by Dr. Krishna. We find also that the contrary medical evidence provided by Dr. Mazella's reports satisfies the "substantiality" standard - - it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, supra, at 401.

**2.   Whether the ALJ Failed to Properly Formulate Plaintiff's RFC by Neglecting to Clearly Develop Plaintiff's Need to Alternate Between Sitting and Standing?**

Plaintiff asserts that her need to alternate between sitting and standing was inadequately addressed by the ALJ's hypothetical question to the vocational expert.  The hypothetical question posed to the vocational expert included the stipulation that Plaintiff's ability to work at the sedentary level was limited, among numerous other factors by "the option to sit or stand at will."  (R.634).

Plaintiff is unsatisfied with this formulation and argues that the degree to which a sit/stand option erodes the occupational base of sedentary jobs went unaddressed.  The Court cannot agree.  The vocational expert clearly contemplated that a sit/stand at will option was necessary to accommodate Plaintiff when she certified that various jobs that exist in significant numbers in the national economy could be performed by a person with Plaintiff's limitations, including the sit/stand limitation.  The Court cannot envision how Plaintiff's need to alternate between sitting and standing positions could have been more clearly addressed than by an "at will" option.  (R.634-636).  Indeed, the vocational expert even testified that these jobs would remain without erosion even if an additional limitation involving the use of a cane was added. (R.636).  Thus, the Court finds that Plaintiff's assignment of error on this point is inappropriate.

**3.   Whether the ALJ Improperly Discredited Plaintiff's Testimony Regarding the Limiting Effects of Pain?**

Plaintiff correctly points out that the agency's own regulations provide: "An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by medical evidence."  See SSR 16-3p.  In this case, the ALJ made the oft-seen observation that, while Plaintiff's medically determinable

30

impairments could reasonably be expected to cause the symptoms
Plaintiff alleges, her statements about the intensity, persistence
and limiting effects of the symptoms were not entirely credible.
(R.26).  The ALJ then stated:

> In this case, the claimant's case in establishing
> disability is directly dependant on the element of
> pain which is of an intractable nature.  Pain is
> subjective and difficult to evaluate, both
> quantitatively or qualitatively.  Nevertheless, most
> organic diseases produce manifestations other than
> pain and it is possible to evaluate the underlying
> processes in degree of resultant impairment by
> considering all of the symptoms.  Generally, when an
> individual has suffered pain over an extended
> period, there will be observable signs such as a
> significant loss of weight, an altered gait or
> limitation of motion, local morbid changes, or poor
> coloring or station.  In the present case, the
> claimant has complained of pain over an extended
> period of time.  None of the above signs of chronic
> pain are evident.  While not conclusory by itself,
> this factor contributes to the determination that
> the claimant is not disabled as a result of pain.

(R.26).  This language is the exact terminology Judge Mannion found

wanting when he remanded this case (then denoted as Middle District of Pennsylvania No. 3:12-cv-01868) on April 29, 2014.  The ALJ's observation that such observable signs of intractable pain as an altered gait or limitation of motion are not present in this case was incorrect in 2014 and remains incorrect today.  The record in this case is liberally sprinkled with documentation of Plaintiff's antalgic gait and limited range of motion in her neck, low back and left hip.[7]  Even Dr. Mazella, upon whom the ALJ relied to subordinate the testimony of Plaintiff's treating physician, posited Plaintiff's "antalgic gait pattern" and "significant restricted range of motion in her left hip and "minimally limited" range of motion in her neck.  Thus, because the ALJ's reasoning for discounting the extent and persistence of Plaintiff's pain and limitation of movement is emphatically contradicted by the record, we find that she, once again, improperly relied upon her own lay opinion in rejecting Plaintiff's subjective complaints of pain.  An ALJ may not rely on her own lay opinion to reject Plaintiff's complaints of pain in the face of contrary medical evidence, and this is more particularly true where the reasons advanced by the ALJ actually conflict with the medical evidence of record. Witkowski v. Colvin, 999 F.Supp. 2d 764, 774 (M.D. Pa. 2014).  This case will be remanded for further proceedings for the self same

---

[7] Plaintiff's antalgic gait and limited range of motion had been documented on numerous occasions by Dr. Krishna.  (R.433-505).  Also, Plaintiff's limited range of motion was documented by Dr. Lattuga.  (R.187).

reason Judge Mannion remanded this matter more than two years ago.
The Court observes and the Agency should take note that, to the
extent Plaintiff's complaints of pain are viewed more expansively
upon the Agency's second review, the RFC determination in this
matter will necessarily require alteration to account for the off-
task disruption caused by such unrelenting pain as may be credited.

**VIII.   Conclusion.**

For the reasons cited in the foregoing Memorandum, the
Plaintiff's assignments of error are rejected but for her
contention that the ALJ's rationale for not fully crediting her
account of the intensity and persistence of her pain is apparently
contradicted by the record.  This case must be remanded for further
proceedings in which the agency either awards Plaintiff benefits or
articulates a valid reason why Plaintiff's seemingly well-
documented complaints of intractable and intense pain were not
found entirely credible.  An Order consistent with this
determination will be filed contemporaneously herewith.

BY THE COURT

                                    S/Richard P. Conaboy
                                    Honorable Richard P. Conaboy
                                    United States District Court


Dated: August 24, 2016